IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

TRACY MOSS,

                    Plaintiff,          Civil No. 12-157 (JBS/KMW)

        v.

RETIREMENT VALUE, LLC, et al.,                **OPINION**

                    Defendants.

APPEARANCES:

Richard J. Sexton, Esq.
Rawle & Henderson
401 Route 73 North
Suite 200
Marlton, NJ 08053
        Attorney for Plaintiff Tracy Moss

George Peter Barbatsuly, Esq.
Rosemary Alito, Esq.
K & L Gates, LLP
One Newark Center
Tenth Floor
Newark, NJ 07102-5252
        Attorneys for Defendant Retirement Value LLC

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

Plaintiff Tracy Moss brought this action against her former employer, Retirement Value ("RV"), and Richard Gray, her former supervisor and RV's former President and principal owner, alleging negligence and claims under Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination ("NJLAD") for hostile work environment sexual harassment, quid

pro quo sexual harassment, and unlawful retaliation. Her claims revolve around Gray's conduct during her interview and her employment from June 2009 through November 2009.

This matter comes before the Court on Defendant RV's motion for summary judgment.[1] [Docket Item 36.] The Court heard oral argument on October 24, 2013. RV's motion will be granted in part and denied in part: there are genuine disputes of material fact regarding Plaintiff's hostile work environment and retaliation claims, but summary judgment will be entered on her quid pro quo and negligence claims.

## II. BACKGROUND

### A. Factual Background

#### i.   Plaintiff's Hiring and Terms of Employment

Paul Brost, a mutual colleague of both Plaintiff and Defendant Gray referred Moss to RV. (Def. Statement of Facts ("SOF") ¶ 2.) Brost, Gray, and Moss met at a restaurant in Philadelphia to discuss opportunities with RV. (Pl. Ex. C, Moss Dep. 34:23-35:20.) Gray met Plaintiff at the Orlando airport on June 6, 2009, while she was vacationing, to interview her.

---

[1] Defendant Richard Gray, who is proceeding pro se, has not filed a motion for summary judgment and this Opinion does not address Plaintiff's claims against Defendant Gray.

Moss states that, at this airport meeting, Gray informed her that "the job was $150,000 job, but since it was a start-up company that he would start me out around 75, and that by year end I would be making a lot more money than that." (Moss Dep. 42:3-7.) Moss perceived that "the position itself would be valued at 150,000, plus bonus. I was promised a bonus of 25,000 plus at the end of the year, I was promised potential ownership in the company and stock options." (Moss Dep. 173:20-24.) Gray testified that it would be "accurate for me to say that Tracy Moss was allowed to have an impression that future part ownership of the company, that was in her future." (Gray Dep. 186:9-11.)

Moss testified that, at the Orlando meeting, Gray "became very flirtatious and was asking me . . . how a good looking woman like me could be single and making comments about how beautiful I was and how come nobody snatched me up yet . . . ." (Moss Dep. 42:11-15.) Gray acknowledges that he told Moss, "how's a girl like you, so beautiful and smart, not married." (Pl. Ex. B, Gray Dep. 121:12-13.) Moss also testified that Gray "stated that he's giving me a great job opportunity, and the best part would be if he could sleep with me because that would be the icing on the cake." (Moss Dep. 42:16-19.) Moss responded "that's not happening." (Moss Dep. 48:20-24.)

3

Days after the Orlando airport meeting, Gray offered Plaintiff employment with RV, and she accepted. (Def. SOF ¶ 8.) She began working at RV in June 2009 at the agreed-upon starting salary of $75,000. (Def. SOF ¶ 4.) Her initial job title was Manager of Licensee Development, and her responsibilities included recruiting potential licensees and preparing sales and marketing materials. (Def. SOF ¶ 4.) She reported directly to Gray. (Def. SOF ¶ 4.)

### ii.  Plaintiff's Encounters With Gray During Her Employment

Although RV was headquartered in Texas, Plaintiff worked primarily from her New Jersey home. (Def. SOF ¶ 5.) She travelled to Texas approximately once a month for meetings, and she had several business trips, including a trip to California with Gray. (Def. SOF ¶ 5.) Moss saw Gray about twice a month during her employment with RV. (Def. SOF ¶ 5.)

Moss testified that "[t]here were multiple advances that [Gray] made to me, and it seemed to be every time that we were in Texas or traveling or visiting agents." (Moss Dep. 163:19-22.)

Moss testified that "every time I had to leave or come or go, he would grab me and . . . hug me tight." (Moss Dep. 170:2-4.) Gray asserts that hugging was common between RV employees:

"People at [RV] hugged all the time . . . . It was a cultural thing." (Gray Dep. 48:3-5.) Moss described another instance when Gray took her to the airport and "he hugged me good-bye, and I said, you know, we should keep this professional and you shouldn't be hugging people. And he says, well, that's what we do in Texas." (Moss Dep. 167:14-18.)

While sitting in the car before a meeting in Texas, Gray told Moss "how he wishes he was a little younger because he was the type of man that I need." (Moss Dep. 164:8-10.) Moss then told Gray that "he shouldn't disrespect me and treat me that way," and he responded, "he knows, but it's hard for him to control himself." (Moss Dep. 164:22-165:1.)

On another visit, Gray took Moss sight-seeing in Texas and "he toured me around and bought me items and bought me a tank top and made me get on a longhorn and take a picture of me and commented on how cute I looked and how good it would be if I lived in Texas . . . ." (Moss Dep. 166:24-167:3.)

Gray once bought Moss earrings and "made the comment about his wife would be very upset if he knew he was buying me things." (Moss Dep. 168:12-14.)

Moss testified that, on one visit, Gray "was commenting on how beautiful I looked and always hugging me and grabbing me. And really I think he was enjoying the attention he was getting

by having me with him . . . ." (Moss Dep. 167:9-13.) Gray once called Moss, after dropping her off at the airport, and said, "I can't believe it, the guy who took your bags commented on what a beautiful girlfriend I had . . . and [Gray] stated that . . . he was very happy that he got the . . . attention from the guy there that I was his girlfriend." (Moss Dep. 167:20-168:2.)

Moss once asked Gray whether there were apartments above RV's office in Texas and Gray replied, "no, my wife wouldn't like . . . you staying here." (Moss Dep. 69:15-17.) Gray also took her to see his new home and "[Moss] said, big enough for lots of people to live here. He said, I just got my wife to start liking you, I don't think she would be happy if I moved you in."[2] (Moss Dep. 73:12-16.) Moss perceived this comment as "strange and bazaar and kind of like he was thinking of me like his girlfriend or something . . . ." (Moss Dep. 74:17-19.) Gray testified that he "probably did quip . . . . 'My wife wouldn't like it very much if you were invited to live here.'" (Gray Dep. 129:3-5.)

---

[2] Moss takes notes constantly. Much of her deposition testimony discussed her notes about her encounters with Gray. These notes are not in the record before the Court. The Court has quoted some aspects of Moss' deposition testimony that either discuss or directly quote these notes.

After the house visit, Gray said, "Sorry he didn't have more time with me. Put his hand on my bare knee and told me . . . he wishes he was a little younger for me. Talked about . . . how lucky he is to work with such a good looking woman." (Moss Dep. 75:12-20.) Moss testified that "it felt like forever" that his hand was on her knee, but that she "pushed it away real quick." (Moss Dep. 78:13-19.) Gray testified that he touched her knee briefly, but that he did so because Moss touched his knee first. (Gray Dep. 65:23-66:1.)

On a business trip to California, Gray wanted to go to fisherman's wharf, so Gray and Moss left their meeting early, even though a business associate wanted to take them to lunch. Gray took Moss to Aliottos restaurant and said it "was the most romantic restaurant in California" and "his wife would be upset." (Moss Dep. 90:6-9.)

Moss generally perceived that Gray "was buttering me up, propositioning me, . . . you're doing a good job, move to Texas, everything will be great." (Moss Dep. 172:5-8.)

### iii. Plaintiff's Positive Comments

Plaintiff made some positive comments about Gray during her employment. For example, on October 16, 2009, Moss sent Gray an email stating, "It is a pleasure to work with you & the 'new' multi-million dollar corporation!!! . . . THANK YOU FOR ALL

'YOU' DO!!!!! Without you, this would NOT be happening!!!!!!!!"
(Pl. Ex. B, Oct. 16, 2009 Email from Moss to Gray.)

When Gray declined to provide RV's proprietary information
to stockbrokers who had requested it, Moss emailed him, "Your
response to these idiots is very appropriate!! No company on
earth would EVER give them that kind of information." (Def. Ex.
E, Oct. 28, 2009 Email from Moss to Gray.)

### iv.  Plaintiff's Raise and Promotion

Moss received a $15,000 raise on November 1, 2009, and she
was promoted to Director of Sales and Marketing. Gray asserts
that she received this raise only because several other
employees received raises and title changes and "[i]t would have
been unfair and structurally incorrect, administratively, almost
abusive, not to have done some kind of a change for Tracy Moss .
. . ." (Gray Dep. 60:17-19.)

### v.  Plaintiff's Termination

Early in her employment, Moss explained to an RV manager,
DeAnne Lewis, that Gray "was making sexual comments to me and
touching me inappropriately and it was a lot to take. It was
making my job very hostile. It was a bad environment." (Moss
Dep. 179:1-4.) DeAnne Lewis and Moss agreed that, when Moss came
to town, "I would set up a meeting, a dinner, a something with
[Lewis] and her husband to get me away from Dick as much as

possible." (Moss Dep. 179:5-8.) Moss complained about Gray's conduct at every dinner with Lewis. (Moss Dep. 180:1-6.) Moss told Lewis that Gray "was over reaching with his sexual comments and his attitude towards me . . . and his unwelcomed intentions . . . that he was making sexual advances to me that were unwanted, and inappropriate comments and inappropriate touching." (Moss Dep. 180:20-181:6.)

On November 13, 2009, Plaintiff had dinner with DeAnne Lewis and Lewis' husband Jonathan. At the dinner, Moss and DeAnne Lewis "discussed that we didn't feel that Wendy had knowledge of the business that she was doing . . . ." (Moss Dep. 149:13-15.) Moss believed Rogers was incompetent. (Moss Dep. 149:16-19.) Moss and DeAnne Lewis "were joking, laughing around, saying that we didn't understand what was the bond between [Gray and Rogers]." (Moss Dep. 149:24-150:1.)

DeAnne Lewis relayed Moss' comments to Rogers who then called Gray. Gray asserts that Rogers "was very upset, she was very distraught . . . ." (Gray Dep. 28:17-18.) Gray spoke to DeAnne Lewis, and, according to Gray, Lewis described both Moss' comments about Rogers and Moss' complaints that Gray had sexually harassed her. (Gray Dep. 32:16-22.) Gray does not recall learning about Moss' sexual harassment complaints before this conversation with DeAnne Lewis. (Gray Dep. 45:16-19.) In

addition, Gray is "unaware" of whether there was "any specific investigation" of Moss' sexual harassment complaints. (Gray Dep. 95:14-18.)

Gray perceived that "it was a two-point barb from Ms. Moss" because she had alleged both that "Dick Gray and Wendy Rogers were or must have been having a sexual relationship or some type of affair" and that "Wendy Rogers was so incompetent . . . that the only reason somebody like Dick Gray would keep Wendy Rogers on the payroll would be for a sexual relationship or an improper relationship." (Gray Dep. 28:22-29:8.)

Gray testified that he received this report from DeLewis "in the context of our growing concern about Ms. Moss' fundamental ability to do the job that she was hired to do or the job that we hoped she would do in the future." (Gray Dep. 43:18-21.) Gray perceived that there were cultural differences between Moss, who was from New Jersey, and the other RV employees, who were based in Texas. Gray testified that Moss was a liability to RV because of her "low necklines and high hemlines and the swishing . . . movement, her joking interaction with people." (Gray Dep. 57:5-11.) According to Gray, she "came across as crude and crass." (Gray Dep. 57:15.) He also mentioned "her aura of the sexuality that she exuded," while describing

another RV employee's reluctance to work with Moss. (Gray Dep. 73:4-5.)

Gray decided to fire Moss "because of her allegations or her comments that I was having – must have been having a sexual relationship with Wendy Rogers." (Gray Dep. 22:4-7.) Gray testified that the decision to terminate Moss "was mine and mine alone." (Gray Dep. 89:16-17.)

On November 15, 2009, two days after dining with the Lewises, Moss received a voicemail and a text from Gray informing her that she would not be going on a planned business trip to Seattle. She briefly spoke with Gray that day and learned that her employment was terminated effective immediately.[3]

At a hearing regarding Plaintiff's application for unemployment benefits, Gray testified that he fired Moss "because of outrageous misconduct and slanderous lies . . . allegedly sexual misconduct on my part with an officer and a principal in this company. And making public statements that I was sexually harassing her, which is far from untrue, it's outrageous and actionable." (Pl. Ex. D, Unemployment Hr'g Tr. at 11.) The hearing referee then asked, "And is that why you made

---

[3] The parties dispute whether Plaintiff was paid through December 31, 2009 or January 9, 2010.

the decision to discharge her, because she was making those allegations?" (<u>Id.</u>) Gray responded, "Absolutely." (<u>Id.</u>)

### vi.   RV's Sexual Harassment Policy

Gray testified that, in November of 2009, RV "probably didn't have a policy or procedure in place [for sexual harassment complaints]. It would have been handled on an ad hoc basis." (Gray Dep. 87:11-13.) RV developed an employee handbook in January 2010. (Gray Dep. 93:22-24.)

### vii. RV's Receivership

On May 5, 2010, the State of Texas filed suit against RV accusing RV of engaging in securities fraud, selling unregistered securities, and violating the Texas Deceptive Trade Practices Act. (Def. SOF ¶ 28.) The 126th Judicial District Court of Travis County, Texas, immediately issued a Temporary Restraining Order ("TRO") and appointed Eduardo Espinosa as RV's Receiver. (Def. SOF ¶ 28.) On May 14, 2010, Espinosa terminated all of RV's employees. (Def. SOF ¶ 29.) According to Espinosa, "had Tracy Moss . . . remained employed by RV as of May 14, 2010, she would have been terminated on that date along with all other RV employees." (Docket Item 36-3, Espinosa Decl. ¶ 3.)

### B. Plaintiff's Claims

Plaintiff asserts the following claims against RV and Gray: (I) violation of Title VII and the NJLAD for hostile work

12

environment sexual harassment; (II) violation of Title VII and the NJLAD for quid pro quo sexual harassment; (III) violation of Title VII and the NJLAD for unlawful retaliation for reporting and/or complaining about sexual harassment; and (IV) common law negligence in failing to maintain a non-discriminatory work environment free of sexual harassment.

**C. Jurisdiction**

The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 for the claims arising under federal law and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for the claims arising under state law.

**D. Procedural History**

After her termination, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Def. SOF ¶ 30.) The EEOC issued Plaintiff a dismissal and right-to-sue notice on June 21, 2011. (Def. SOF ¶ 30.) On November 9, 2011, Plaintiff filed a Complaint in the Superior Court of New Jersey, Burlington County. (Def. SOF ¶ 31.) RV removed this action to this Court on January 9, 2012. (Def. SOF ¶ 32.)

**E. Parties' Arguments**

Defendant RV seeks summary judgment on all claims. RV argues that Plaintiff was not sexually harassed, thus precluding

the hostile work environment and quid pro quo harassment claims; her employment was terminated for alleging that Rogers had a sexual relationship with Gray, not for complaining about sexual harassment; her negligence claims fail as a matter of law because all of her other claims lack merit; and, even if she had been unlawfully terminated, her claims for economic loss damages are limited to lost earnings from the date of her last paycheck to May 14, 2010, when all RV employees were terminated.

Plaintiff argues that the harassment was severe and pervasive and that her termination shows both retaliation and quid pro quo harassment because it was only two days after she complained to DeAnne Lewis about the harassment and only two weeks after she received a raise and a promotion. Moreover, Plaintiff emphasizes that she never received the $150,000 salary, ownership interest, and year-end bonus to which she was entitled, thus showing quid pro quo harassment. Plaintiff also argues that her negligence claim stands because her other claims should survive summary judgment, RV lacked a formal procedure for reporting or investigating harassment, and, when Plaintiff did complain, she was fired without any investigation. Finally, Plaintiff asserts that her economic loss damages should not be limited because RV still has millions of dollars in assets and, in other contexts, such as Worker Adjustment Retraining Act

14

claims, employees can be entitled to damages beyond the time period when an employer ceased operations.


## III. ANALYSIS

### A. Standard of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court "cannot try issues of fact on a Rule 56 motion but only is empowered to determine whether there are issues to be tried." Wright & Miller, et al., § 2712 Purpose, Scope, and Construction of Rule 56, 10A Fed. Prac. & Proc. Civ. § 2712 (3d ed.).

Parties must support their factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions,

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court must "draw all reasonable inferences in favor of the non-movant." Kowalski v. L & F Products, 82 F.3d 1283, 1288 (3d Cir. 1996).

### B. Hostile Work Environment

RV asserts that Plaintiff's hostile work environment fails because she has not established unwelcome sexual conduct that was severe or pervasive, unreasonably interfered with her performance, and created an intimidating, hostile, or offensive working environment. RV's arguments lack merit.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The NJLAD also "specifically prohibits employment discrimination based on sex," including "sexual harassment." Lehmann v. Toys R Us, Inc., 132 N.J. 587, 600-601 (1993); N.J.S.A. § 10:5-12(a). "Because the hostile work environment analyses for Title VII claims and NJLAD claims are 'strikingly similar' the Court will analyze both simultaneously." Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 576 n.10 (D.N.J. 2005) (quoting Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)); see also Hargrave v. County of Atlantic, 262 F.

Supp. 2d 393, 411 n. 7 (D.N.J. 2003) ("this Court's analysis of Plaintiff's allegations of sexual . . . harassment applies equally to both her Title VII and NJLAD hostile work environment claims").

Plaintiff must show: "(1) that she suffered intentional discrimination because of her sex, (2) that the discrimination was severe or pervasive, (3) that the discrimination detrimentally affected her; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) that a basis for employer liability is present." Theriault v. Dollar Gen., 336 F. App'x 172, 174 (3d Cir. 2009).

Plaintiff meets the first factor because Gray's comments toward Moss were based on her sex. "To make out a case under Title VII it is 'only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff had been a man she would not have been treated in the same manner.'" Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990) (quoting Tomkins v. Public Serv. Elec. & Gas Co., 568 F.2d 1044, 1047 n. 4 (3d Cir. 1977)). To constitute impermissible discrimination, "the offensive conduct is not necessarily required to include sexual overtones in every instance . . . ." Id. Gray frequently commented on Moss' attractiveness, her gender, and the possibility of a

17

relationship with her. RV argues that many of Gray's comments were not overtly sexual, including his statements that Moss looked cute; that it would be great if Moss moved to Texas; and that his wife would be displeased if Moss moved to Texas, if she knew that Gray bought Moss earrings, and if she knew that Gray took Moss to Aliotto's. (RV Br. Supp. Mot. Summ. J. at 19-20.) Reasonable jurors could find that these comments were intentional discrimination based on sex and could find that Gray would not have bought earrings for a man or told a man that Gray's wife would be jealous if the man moved to Texas. In addition, "given the overtly sexual nature of some of the comments, a jury might infer that statements which otherwise might not be interpreted as sexual in nature indeed were intended to be such." <u>Lidwell v. Univ. Park Nursing Care Ctr.</u>, 116 F. Supp. 2d 571, 582 (M.D. Pa. 2000).

In terms of the second factor, to determine whether the discrimination was severe or pervasive, the Court must evaluate "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'" <u>Theriault v. Dollar Gen.</u>, 336 F. App'x 172, 174 (3d Cir. 2009) (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)). "'[S]imple teasing,'

18

offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the 'terms
and conditions of employment.'" Faragher, 524 U.S. at 788
(internal citation removed).

   The Court cannot conclude, as a matter of law, that Gray's
conduct was neither severe nor pervasive. Plaintiff claims that
the following conduct created a hostile work environment: at her
job interview, Gray suggested that they should have a sexual
relationship; he also asked why such an attractive woman was
unmarried; Gray hugged her tightly every time she arrived and
left; Gray placed his hand on her knee; Gray bought her earrings
and a tank top; Gray said his wife would be upset if Moss lived
in close proximity, if she knew that Gray had taken Moss to
Aliotto's restaurant, and if she knew that Gray bought Moss
earrings; he took Moss sight-seeing in Texas and to a romantic
restaurant in California; he told her that he wished he was
younger for her; and Gray told her that she had been mistaken
for his girlfriend and seemed pleased about that fact. Plaintiff
testified that Gray acted or spoke suggestively toward her every
time that he saw her.

   RV argues that Gray's comments were isolated, minor
incidents and, even those comments that could be construed as
sexual, were simple teasing. A reasonable fact-finder could

conclude that these incidents were not isolated because they occurred every time that Moss saw Gray. See Lidwell v. Univ. Park Nursing Care Ctr., 116 F. Supp. 2d 571, 582 (M.D. Pa. 2000) ("The comments may not have been great in number, but Lidwell only worked weekends, so that the comments would not have to be as numerous to be a regular occurrence"). Although some comments were minor, the Court must consider the totality of the circumstances. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990) ("a discrimination analysis must concentrate not on individual incidents, but on the overall scenario").  Gray also hugged Moss tightly every time she arrived and left, and he touched her knee. A reasonable fact-finder could find that these contacts, in addition to his comments, contributed to a hostile work environment because "physical touching would certainly be highly probative evidence of sexual harassment." Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 578 n.13 (D.N.J. 2005). RV argues that "Plaintiff complains that Gray hugged her in greeting and farewell, but she offers no evidence to contradict Gray's explanation that this was his practice with all of his employees." (RV Reply at 8.) Moss' testimony was that "he would grab me and . . . hug me tight;" that allegation is sufficient, in conjunction with the

other evidence in the record, to create a genuine dispute of material fact regarding the nature of Gray's contacts with Moss.

In addition, the fact that Gray was Moss' supervisor and RV's President and principal owner further supports Plaintiff's hostile work environment claim because "acts of supervisors have greater power to alter the environment than acts of coemployees generally." Faragher v. City of Boca Raton, 524 U.S. 775, 805 (1998); see also Bodnar v. Imagistics Int'l, Inc., Civ. 04-3451, 2006 WL 758306, at *5 (D.N.J. Mar. 21, 2006) ("a jury could reasonably conclude that the impact and severity of Leonard's comments were aggravated by the fact that he was a member of the management, with direct responsibility for supervising Plaintiff's work performance").

RV argues that Gray's comment at Moss' interview that "if he could sleep with [Moss] because that would be the icing on the cake" was "simple teasing." The Court cannot make such a conclusion as a matter of law. A reasonable fact-finder could perceive that comment as sexual harassment, particularly because it came from the interviewer, who was the company President. A reasonable jury could conclude that Plaintiff has satisfied the severe-or-pervasive prong.

In terms of the third and fourth factors, the Court cannot conclude, as a matter of law, that the discrimination did not

detrimentally affect Moss or that a reasonable person in her circumstances would not have been detrimentally impacted. A sexual proposition, suggestive comments, and physical contact from a supervisor could detrimentally impact a reasonable person in like circumstances, particularly when this conduct occurred in every encounter with the supervisor. Moss testified that she complained about Gray's conduct often and asked DeAnne Lewis to spend time with her to avoid Gray. She also testified that she told Gray not to disrespect her.

As evidence that there was no detrimental effect, RV cites Moss' positive emails toward Gray, including one email stating, "It is a pleasure to work with you . . . THANK YOU FOR ALL 'YOU' DO!!!!!" and another email stating "Your response to these idiots is very appropriate!!" The Court cannot conclude that these emails establish, as a matter of law, that there was no detrimental effect on Moss, particularly given the evidence about her frequent complaints about Gray's conduct. RV also argues that Moss "admittedly did not experience any physical or emotional injury as a result of Gray's alleged 'harrassment.'" (RV Br. Supp. Mot. Summ. J. at 20.) As support for this assertion, RV cites deposition testimony in which Moss was asked "you're not claiming that you had any physical or mental illnesses as a result of anything in this case . . ." and she

responded "no." (Moss Dep. 191:23-192:1.) A reasonable fact-finder could find that this testimony does not indicate that Moss did not suffer any emotional or physical injury. She was asked about physical or mental illnesses; illnesses are not identical to emotional injury. Moreover, because Plaintiff "must only establish that she subjectively perceived her work environment to be hostile or abusive, and not that she suffered 'concrete psychological harm,' she has a relatively low hurdle to clear." Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 578 (D.N.J. 2005) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). Giving Plaintiff the benefit of reasonable inferences, a jury could find that the subjective and objective elements of the hostile work environment test are satisfied.

Finally, there is a basis for employer liability because Gray was RV's President and principal owner during Moss' employment.

RV cites Funayama v. Nichia Am. Corp., 482 F. App'x 723, 725 (3d Cir. 2012) cert. denied, 133 S. Ct. 1820 (2013), in which the Third Circuit upheld the district court's grant of summary judgment on the plaintiff's hostile work environment claims. The Third Circuit held that a "handful of incidents" were "not sufficiently severe or frequent to support a hostile work environment claim." Id. at 725. The incidents were

23

separated by several years: The company president made sexual advances toward the plaintiff outside the office in 1999, suggested they share a room on a business trip in 2001, gave her a sexually explicit book in 2003 and a sexually explicit magazine in 2007, and made a comment about her body in 2008. Id. In this case, by contrast, Plaintiff testified that the harassment occurred every time Moss encountered Gray. In addition, the Funayama court noted that "[t]he only ongoing conduct [plaintiff] advanced in support of her claim were [the company president]'s invitations to go out with him, which stopped in 2003 once she clearly declined them, and his touching of her back and side, which [plaintiff] did not find overly offensive at the time." Id. This case is clearly distinguishable because, in this case, Gray's conduct never stopped, even though Moss asked him to stop disrespecting her.

RV cites Lynch v. New Deal Delivery Serv. Inc., 974 F. Supp. 441, 452 (D.N.J. 1997), which is also inapposite. The Lynch court noted that the plaintiff's female coworkers, not her supervisor, had initiated the hiring of a stripper for plaintiff's birthday. The Lynch court noted that "[defendant] phoned her . . . at night to discuss business, but Lynch concedes that he never proposed anything improper. Lynch also admits that when she declined [defendant]'s dinner invitations,

24

he did not pursue the issue further or act in a hostile manner toward her." Id. at 451. In this case, Gray did propose an improper liaison with Plaintiff and engaged in other improper and sexually suggestive conduct.[4]

The Court will deny RV's motion for summary judgment on Plaintiff's hostile work environment claims under Title VII and the NJLAD. Construing the evidence in the light most favorable to Plaintiff, the Court holds that a reasonable jury could

---

[4] RV also cites Morales-Evans v. Admin. Office of the Courts of New Jersey, 102 F. Supp. 2d 577 (D.N.J. 2000), in which the court granted summary judgment on the hostile work environment claim. Morales-Evans does not bind this Court. Moreover, this Court respectfully disagrees with the outcome and would have denied summary judgment because a reasonable jury could have found the work environment hostile. The plaintiff, Evans, reported an incident when a coworker forcibly kissed her to her supervisor, Coleman. Upon receiving Evans' complaint, Coleman emerged from his office and joked to other staff members that he had told them not to put a "desperate sign" on Evans' back. Id. at 580. Coleman further stated "I can't help it if you are so voluptuous, maybe he was trying to get his tongue in between your gap." Id. Upon hearing Evans sneeze, Coleman inquired who had sneezed and commented that the loudness of a person's sneeze correlates with the noise she makes during intercourse. He also publicly discussed his visit to a nude beach and described the differences between his genitalia and that of other men at the beach. For a period, Coleman also visited Evans' office daily to invite her to lunch or out after work. He told Evans that he wanted to hire and work with beautiful people and frequently joked about his aversion to working with "ugly people." Id. at 579. On at least one occasion, Coleman visited Evans' house uninvited, even though she had never given him her address directly. He also grabbed her hand while walking into a work function, and he kissed her multiple times on the cheek.

conclude that Plaintiff was subject to a hostile work environment.

### C. Quid Pro Quo

RV asserts that Plaintiff's quid pro quo sexual harassment claim fails because Gray never stated that her employment was contingent upon a sexual relationship and, despite the fact that she repeatedly rebuffed his advances, she was hired, promoted, and given a raise. The Court will grant RV's motion on the quid pro quo claims.

"'[U]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute [quid pro quo] sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual . . . .'" Bonenberger v. Plymouth Twp., 132 F.3d 20, 27 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997)). The Court's analysis under the NJLAD and Title VII is the same. See Bouton v. BMW of N. Am., Inc., Civ. 90-2884 (WGB), 1994 WL 447310, at *4 (D.N.J. Apr. 13, 1994) aff'd, 29 F.3d 103 (3d Cir. 1994) (the jury's "rejection of these [NJLAD quid pro quo] claims precludes a finding in Bouton's favor on

the Title VII quid pro quo claims, which require essentially the same showing").

Plaintiff "admit[s] that Gray never explicitly advised Tracy Moss that her employment at RV and advancement at RV was contingent upon her entering into a romantic or sexual relationship with Gray." (Pl. SOF ¶ 19.) Plaintiff argues that she "believed that Gray was letting her know that her position with the company would become secure and she would receive favorable treatment from Gray in exchange for entering into a romantic or sexual relationship with Gray." (Pl. SOF ¶ 19.) Plaintiff does not cite any evidence supporting this assertion, and there is evidence showing that Gray did not make submission to his sexual advances a condition of employment. Gray propositioned Moss at her job interview, she denied him, and he hired her anyway. In addition, during her employment, Gray repeatedly made advances that she rebuffed, yet she was promoted and received a $15,000 raise.

Plaintiff argues that her quid pro quo claim should stand because she did not receive the $150,000 salary, year-end bonus, and ownership shares that Gray described in her job interview. But Plaintiff has also acknowledged that Gray said her starting salary would be $75,000 and that she received a $15,000 raise after only four months of employment. There is no evidence

27

indicating that Plaintiff did not receive a bonus or a larger raise because she rebuffed Gray's advances.

Plaintiff also cites her termination as evidence of quid pro quo harassment. A termination can be the basis for a quid pro quo claim when there is evidence that the termination was connected to rejection of a sexual advance. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000) ("find[ing] ample evidence from which to infer a causal connection between Farrell's rejection of DeLong's advance and her subsequent termination that enables Farrell to make out a prima facie case for both her claim of retaliation and her claim of quid pro quo sexual harassment"). While there is a genuine dispute of material fact as to whether Gray terminated Plaintiff for complaining about the harassment, discussed infra, there is no indication that she was terminated because she rebuffed his advances.

RV's motion for summary judgment on Plaintiff's quid pro quo claims will be granted.

**D. Retaliation**

RV argues that Plaintiff's retaliation claim fails because she cannot establish a causal link between her complaints and the termination; RV notes that Plaintiff had complained for months about Gray's conduct without any repercussions and that

RV had a legitimate reason for the termination, namely Plaintiff's comments about Rogers.

Title VII's anti-retaliation provision mandates that it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). This anti-retaliation provision covers "employer actions that would have been materially adverse to a reasonable employee or job applicant." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). In other words, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. Similarly, the NJLAD prohibits "any person [from taking] reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act." N.J.S.A. § 10:5-12(d). "While this discussion focuses on Title VII, the same analysis applies to [Plaintiff]'s NJLAD claim." Davis v. City of Newark, 417 F. App'x 201, 203 n.2 (3d Cir. 2011).

To establish a prima facie case of retaliation, a plaintiff must show that: "'(1) she engaged in activity protected by Title

VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Philadelphia, 461 F. 3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F. 3d 383, 386 (3d Cir. 1995)). Once the plaintiff establishes a prima facie case, "the burden shifts to the defendant to rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge." Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). The plaintiff may then show that "the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated . . . ." Id.

Plaintiff has established a prima facie case. She engaged in a protected activity by complaining about Gray's sexual harassment to DeAnne Lewis, an RV manager, who then informed Gray. Gray testified that he did not recall hearing about Plaintiff's complaints before DeAnne Lewis informed him. Gray took an adverse employment action by terminating Moss. In addition, because the termination occurred two days after Gray learned about Moss' harassment complaints, the Court can infer a causal connection. "[E]vidence of temporal proximity between the protected activity and the adverse employment action may

establish causation." Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 582 (D.N.J. 2005); see also Jalil v. Avdel Corp., 873 F.2d at 708 ("[Plaintiff] demonstrated the causal link between the [protected activity and the adverse action] by the circumstance that the discharge followed rapidly, only two days later, upon [defendant]'s receipt of notice of [plaintiff's] EEOC claim"). Plaintiff has therefore established a prima facie case of retaliatory discharge.

RV argues that Gray had a legitimate basis to terminate Moss because Moss was making allegations about Wendy Rogers' incompetence and Rogers' relationship with Gray. Plaintiff has, however, raised a material issue of disputed fact about whether this stated reason is pretextual. At the unemployment benefits hearing, Gray said fired Moss "because of outrageous misconduct and slanderous lies . . . allegedly sexual misconduct on my part with an officer and a principal in this company. And making public statements that I was sexually harassing her, which is far from untrue, it's outrageous and actionable." (Pl. Ex. D, Unemployment Hr'g Tr. at 11.) Reasonable jurors could interpret this statement to indicate that Moss' sexual harassment complaints motivated Gray to terminate her, particularly because he terminated her only two days after her dinner with Lewis.

RV argues that "a fair reading of Gray's testimony at that hearing . . . is that Plaintiff was fired not for her alleged complaints of harassment, but because of the comments attributed to her about Rogers" and that Gray's comments were "not artfully stated." (RV Reply at 3, 12.) RV further states, "[t]o the extent that Gray's testimony at the unemployment hearing can be viewed as suggesting that he had an additional reason for discharging Plaintiff, it was not Plaintiff's complaints of harassment to Lewis . . . but rather, Plaintiff's 'public statements' to that effect." (RV Reply at 12 n.4.) The Court cannot take the place of the fact-finder and, thus, can neither assume that Gray's testimony was "not artfully stated" nor speculate about a "fair reading" of that testimony. The Court also cannot assume that the "public" nature of Plaintiff's allegations, as opposed to the allegations themselves, motivated Gray. Plaintiff has raised a genuine issue of material fact regarding Gray's intent in terminating her. "When the defendant's intent has been called into question, the matter is within the sole province of the factfinder." Jalil v. Avdel Corp., 873 F.2d at 707. RV's motion for summary judgment on Plaintiff's retaliation claims is denied.

### E. Negligence

Plaintiff asserts that RV was negligent in failing to have suitable anti-discrimination policies and complaint mechanisms in place, and she argues that the harassment and the retaliatory termination could have been avoided if RV had maintained informal or formal complaint mechanisms. RV argues that, because Plaintiff's Title VII and NJLAD claims fail, her negligence claim fails as a matter of law. RV advanced no other arguments in its briefing regarding Plaintiff's negligence claim. At oral argument, RV argued that summary judgment was warranted on Plaintiff's negligence claims because negligence is not a stand-alone claim and, instead, is a mechanism that the New Jersey Supreme Court has used to hold employers liable under the NJLAD. This argument is meritorious.

Plaintiff notes that Gray testified that, in November of 2009, RV "probably didn't have a policy or procedure in place" for sexual harassment complaints. (Gray Dep. 87:11-13.) RV also did not have an employee handbook during Moss' employment. (Gray Dep. 93:22-24.) Plaintiff emphasizes that the New Jersey Supreme Court has stated that "a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal

33

complaint structures, training, and/or monitoring mechanisms."
Lehmann v. Toys R Us, Inc., 132 N.J. 587, 621 (1993).

Lehmann did not involve independent negligence claims. The
Lehmann court addressed "questions concerning hostile work
environment sexual harassment claims under the New Jersey Law
Against Discrimination," including the question of "what is the
scope of an employer's liability for a supervisor's sexual
harassment that results in creating a hostile work environment?"
Id. at 592. The Lehmann court concluded that "in determining an
employer's liability for compensatory and punitive damages when
an employee raises a hostile work environment discrimination
claim against a supervisor . . . agency principles, which
include negligence, should be applied . . . ." Id. at 626. In
other words, the Lehmann court held that an employer could be
held liable for a supervisor's harassment if, inter alia, the
employer had been negligent in failing to promulgate anti-
harassment policies. See Gaines v. Bellino, 173 N.J. 301, 312-13
(2002) ("In Lehmann, we considered what standards should apply
when assessing employer liability under the [NJ]LAD . . . .
[and] identified section 219(2)(b) of the Restatement (Second)
of Agency as an alternative basis in negligence for employer
liability.")

Plaintiff also cites Llerena v. J.B. Hanauer & Co., 368 N.J. Super. 256, 263 (Ch. Div. 2002), which noted that the defendant employer "may be found negligent 'in combating the creation of a sexually discriminatory hostile work environment by failing to establish meaningful and effective policies and procedures for employees to use in response to harassment.'" (quoting Gaines v. Bellino, 173 N.J. at 318). But the Llerena case, like Lehmann, did not involve stand-alone negligence claims; the Llerena plaintiff presented NJLAD and intentional infliction of emotional distress claims. The issue in the Llerena opinion was whether the plaintiff was entitled to discovery of a confidential settlement agreement in another sexual harassment case against the same employer, JBH, because she argued that she had "interest in learning what JBH knew, when JBH knew it, and how JBH responded to a prior complaint for sexual harassment filed by a female employee." Id. at 264. That inquiry was relevant to the question of whether the defendant employer had been negligent in the creation of the hostile work environment that the plaintiff experienced.

The Lehmann and Llerena cases both involved mechanisms, including negligence, by which an employer could be held liable for the misconduct of employees under the NJLAD. They did not involve stand-alone negligence claims. In the present case,

there is no question that RV would be liable if Plaintiff
prevailed on her hostile work environment and retaliation claims
because Richard Gray was RV's President and principal owner, in
addition to being her supervisor. In other words, there is no
need for negligence principles because RV is directly liable for
Gray's actions.

The Court will grant summary judgment to Defendant RV on
Plaintiff's negligence claim because Plaintiff cannot assert a
stand-alone negligence claim under New Jersey law.

**F. Limitation on Economic Loss Damages**

RV argues that Plaintiff's economic loss damages should be
limited to the period from the date of her last pay period[5] to
May 14, 2010, when all RV employees were terminated.

"Back pay is designed to make victims of unlawful
discrimination whole by restoring them to the position they
would have been in absent the discrimination." Donlin v. Philips
Lighting N. Am. Corp., 581 F.3d 73, 84 (3d Cir. 2009). Back pay
or front pay damages are unavailable for any period after which
"the employee, absent discrimination, would not have continued
to work for the employer . . . ." Quinlan v. Curtiss-Wright

---

[5] The parties dispute the date of Plaintiff's last pay period.
The Court has only addressed whether Plaintiff may be entitled
to damages for lost pay after May 14, 2010. The precise date of
her last pay period remains to be determined.

Corp., 425 N.J. Super. 335, 352 (App. Div. 2012). In the present case, all RV employees were terminated on May 14, 2010 and Plaintiff has not offered any evidence indicating that she would have remained employed by RV after that date.

Plaintiff analogizes to Worker Adjustment Retraining Act (WARN) cases, arguing that "employers do not have carte blanche to close up shop without any advance warning to their employees." (Pl. Opp'n at 23.) WARN mandates that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order . . . ." 29 U.S.C. § 2102(a). The WARN Act only applies to employers with 100 or more employees. 29 U.S.C. § 2101(a)(1). New Jersey has a similar statute, "Plant Closings, Transfers, Mass Layoffs," which applies to the "termination of employment of 50 or more full-time employees" or to "mass layoff[s]". N.J.S.A. § 34:21-1. Plaintiff has not adduced any evidence indicating that these laws apply to RV.

Plaintiff emphasizes that RV was closed due to fraudulent securities activity and that RV still has millions of dollars in assets. The size of RV's assets does not impact whether Plaintiff is entitled to back pay. There is no genuine dispute about the fact that Plaintiff would not have been employed at RV past May 14, 2010 and therefore, her damages in terms of pay are

limited to the period from her last paycheck to that date. This holding does not preclude other forms of damages. Partial summary judgment will be entered for Defendant RV declaring that Plaintiff's economic damages, if any, do not extend past May 14, 2010.

## V. CONCLUSION

RV's motion for summary judgment on Plaintiff's hostile work environment and retaliation claims is denied. RV's motion will be granted as to Plaintiff's negligence quid pro quo claims. Plaintiff's damages in terms of pay are limited to the period from her last paycheck to May 14, 2010. The accompanying Order will be entered.

**October 29, 2013**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge